**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

JONATHAN IRONS,                                     )
                                                    )
         *Plaintiff*,                               )          Case No.
                                                    )
         *v.*                                       )
                                                    )
JOHN NESKE, RICHARD MORRELL,                        )
DOUGLAS TINKHAM, the ESTATE of                      )
MICHAEL HANLEN, RICKY                               )
LUETKENHAUS, MARK O'NEILL,                          )
UNKNOWN EMPLOYEES of the CITY OF                    )
O'FALLON and ST. CHARLES COUNTY                     )
the CITY OF O'FALLON, and ST.                       )          **JURY TRIAL DEMANDED**
CHARLES COUNTY,                                     )

         *Defendants*.

## COMPLAINT

NOW COMES Plaintiff, JONATHAN IRONS, by his attorneys LOEVY & LOEVY, and

complaining of Defendants JOHN NESKE, RICHARD MORRELL, DOUGLAS TINKHAM,

the ESTATE of MICHAEL HANLEN, RICKY LUETKENHAUS, MARK O'NEILL,

UNKNOWN EMPLOYEES of the CITY OF O'FALLON and ST. CHARLES COUNTY, the

CITY OF O'FALLON, and ST. CHARLES COUNTY, states as follows:

### INTRODUCTION

1.      Plaintiff Jonathan Irons was wrongly convicted of the January 1997 burglary and

shooting of Stanley Stotler in O'Fallon, Missouri.

2.      Irons was just 16 years old when he was arrested and he spent 23 years in prison

as an innocent man until the Missouri courts finally threw out his conviction.

3.      Irons had nothing to do with the crime and he has always maintained his

innocence.

4.      In addition to a strong alibi, not one piece of fingerprint, DNA, or other physical evidence connected Irons to the Stotler shooting.

5.      To the contrary, a forensic report analyzing fingerprints left at the scene excluded Irons and implicated a different individual as the perpetrator. The Defendants deliberately concealed that exculpatory forensic report from Irons.

6.      In fact, instead of disclosing the exculpatory forensic report, the Defendants created a doctored version of the report, which deleted the exonerating fingerprint evidence.

7.      In addition, though the victim Stotler survived the shooting, he could not identify the perpetrator given the circumstances of the crime and the injuries he had suffered. Nevertheless, the Defendants manipulated Stotler into identifying Irons using highly suggestive identification procedures. The fabricated identification was solely the result of the Defendants' misconduct.

8.      To frame Irons for the Stotler shooting, the Defendants also concocted an entirely fictional claim that Irons confessed to the crime. This was false. Irons repeatedly and steadfastly denied any involvement in the Stotler shooting, and the Defendants destroyed notes and recordings of their interrogation of Irons that would have proved they were lying.

9.      Irons's arrest, prosecution, and conviction were based on this and other shocking misconduct by the Defendants, all police officers with the O'Fallon Police Department and St. Charles County Sheriff's Department.

10.      In July 2020, based on the discovery of the suppressed exculpatory forensic report and evidence revealing that the Defendants had replaced it with a doctored version—as well as other evidence of the Defendants' egregious misconduct and Irons's innocence—Irons's conviction was vacated and all charges against him were dropped.

11.     More than 23 years after his nightmare began, Irons was finally exonerated.

12.     Irons now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 and Missouri law to redress the Defendants' tortious conduct and their deprivation of Irons's rights secured by the U.S. Constitution.

14.     This Court has jurisdiction of Irons's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Irons's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Irons's conviction.

## PARTIES

16.     Plaintiff Jonathan Irons spent more than 23 years wrongly incarcerated for a crime he did not commit.

17.     At all times relevant to the events described in this Complaint, Defendants John Neske, Richard Morrell, Douglas Tinkham, now-deceased officer Michael Hanlen, and other unknown law enforcement officers were police officers in the O'Fallon Police Department.

18.     Michael Hanlen died before this Complaint was filed, and the Estate of Michael Hanlen is sued as successor in interest to Michael Hanlen.

19.     At all times relevant to the events described in this Complaint, Defendants Ricky Luetkenhaus, Mark O'Neill, and other unknown law enforcement officers were police officers in the St. Charles County Sheriff's Department.

20.     The investigation of the Stotler crime was conducted jointly by the City of
O'Fallon, via the O'Fallon Police Department, and St. Charles County, via the St. Charles
County Sheriff's Department. The above-named Defendants assisted one another in the
investigation, shared information, and individually and collectively participated in the
misconduct alleged in this Complaint, and also facilitated, condoned, approved, and turned a
blind eye to each other's misconduct.

21.     The City of O'Fallon is or was the employer of Defendants Neske, Morrell,
Tinkham and Hanlen. Each of the Defendants named in this Complaint acted during their
investigation of the Stotler shooting as agents or employees of the City of O'Fallon. The City of
O'Fallon is liable for all torts committed by the Defendants pursuant to the doctrine of
*respondeat superior*. Additionally, the City of O'Fallon is responsible for the policies and
practices of the O'Fallon Police Department, and is liable for violations of Plaintiff's rights
caused by the unconstitutional policies and customs of the O'Fallon Police Department,
including actions of the above-named Defendants employed by the City of O'Fallon and/or St.
Charles County undertaken pursuant to those policies and customs during the Stotler shooting
investigation.

22.     St. Charles County is or was the employer of Defendants Luetkenhaus and
O'Neill. Each of the Defendants named in this Complaint acted during their investigation of the
Stotler shooting as agents or employees of St. Charles County. St. Charles County is liable for all
torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally,
St. Charles County is responsible for the policies and practices of the St. Charles County
Sheriff's Department, and is liable for violations of Plaintiff's rights caused by the
unconstitutional policies and customs of the St. Charles County Sheriff's Department, including

actions of the above-named Defendants employed by the City of O'Fallon and/or St. Charles County undertaken pursuant to those policies and customs during the Stotler shooting investigation.

23.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

24.     Just before 6:40 p.m. on January 14, 1997, Stanley Stotler returned from work to his home at 1305 Shallow Lake Drive in O'Fallon, Missouri. After entering his house, he heard someone in his bedroom closet.

25.     Stotler retrieved a gun that he kept under his mattress and, pointing it at the closet, he told the person to come out and that he was going to call the police.

26.     The closet door opened and the intruder fired a gun, hitting Stotler in the right arm. The intruder then stepped out of the closet, shot Stotler in the right temple, and fled the house through the front door.

27.     During the encounter, Stotler fired one shot from his own gun. That gun was not recovered at the scene, apparently because it was taken by the intruder.

28.     Immediately after the crime, Stotler called 911. The call came in at 6:42 p.m. On the call, the only description he could give of the intruder was that he was a Black male. He informed the 911 dispatcher that he did not see what the intruder was wearing and that he did not know if the intruder said anything to him.

29.     In addition, Stotler erroneously reported that he had only been shot once and that the intruder was still inside the house.

30.     Stotler was taken to the hospital, where he had emergency brain surgery and ultimately survived. He was hospitalized until March, when he returned home. He was then hospitalized again in July 1997 for additional surgery as a result of complications from the bullet wound to his skull.

**The Defendants' Investigation Revealed Irons Could Not Have Been the Perpetrator**

31.     Defendant Neske and other Defendants from the O'Fallon Police Department conducted an initial canvass of the neighborhood and learned that 16-year old Jonathan Irons had been in the neighborhood on the day of the Stotler shooting.

32.     Irons had in fact been in the neighborhood and he was friends with a number of kids who lived near Stotler's house.

33.     Because Stotler had only been able to describe the perpetrator as a Black male, and because Irons is Black, the Defendants decided that he should be a suspect in the case.

34.     The Defendants decided that Irons should be a suspect with absolutely no evidence to implicate him in the crime.

35.     Moreover, shortly after deciding that Irons was a suspect, the Defendants' own investigation revealed that he could not have committed the crime.

36.     The Defendants learned that Irons had a strong alibi that made it impossible for him to be the perpetrator. They learned, for example, that Irons had stopped by the home of Crystle and Amber Boeckman three times on the evening of January 14, including at 6:40 p.m., the same time that the crime was occurring.

37.     The Boeckman and Stotler houses were a sufficient distance apart that Irons could not have quickly moved between houses and could not have been in two places at once.

**Forensic Evidence Collected by the Defendants Also Excludes Irons**

38.     The crime scene evidence at the Stotler home also excluded Irons.

39.     The Defendants collected numerous items of potential forensic value. Not one item of evidence implicated Irons.

40.     In fact, no DNA or physical evidence ever linked Irons to the crime scene.

41.     According to the Defendants, the perpetrator had entered Stotler's home through a broken rear basement window, where the investigators found a plastic bag containing a compact disc player, compact discs, and other items believed to have been left by the perpetrator. No DNA, fingerprint, or other physical evidence was found linking Irons to those items.

42.     The Defendants believed that the perpetrator exited through Stotler's front door, which was open when the police arrived at the scene. Defendant Luetkenhaus collected three fingerprints from the interior of the front storm door. None of those fingerprints belonged to Irons.

**The Defendants Decide to Fabricate a Case Against Irons**

*The Defendants Doctor a Fingerprint Report to Conceal Exculpatory Information*

43.     Defendant Luetkenhaus, in concert with the other Defendants investigating the Stotler shooting, deliberately doctored a forensic report in order to conceal from Irons highly exculpatory information.

44.     The forensic report disclosed to Irons before trial contained fingerprint analysis of the three fingerprints that the Defendants collected from the front storm door through which the intruder fled Stotler's home. The disclosed fingerprint report indicated only that none of those fingerprints belonged to Irons.

45.     But the Defendants had doctored the report that they provided to Irons. In their personal possession, the Defendants had another version of the same report, which contained a

startling fact: one of the three fingerprints from the storm door belonged to someone other than Stotler or Irons.

46.     Given that Stotler lived alone and never identified any other possible source of the fingerprint, and in light of the fact that the fingerprint was found on the door through which the perpetrator exited Stotler's home, the fingerprint very likely belonged to the real perpetrator.

47.     The forensic finding in the undisclosed fingerprint report was highly exculpatory and would have been powerful evidence of Irons's innocence at trial.

48.     But the Defendants never disclosed this information to prosecutors or to Irons and his defense counsel.

49.     Instead, the Defendants disclosed only the doctored version of the fingerprint report.

50.     Leaving no doubt that the Defendants' suppression of this information was intentional, Defendant Luetkenhaus falsely testified at trial that all of the fingerprints found at the scene matched Stotler.

*The Defendants Fabricate an Identification From Stotler*

51.     But the Defendants' efforts to frame Irons did not stop with their suppression of the fingerprint evidence and their fabrication of a false report to cover that evidence up.

52.     In addition, the Defendants fabricated an identification of Irons from Stanley Stotler, who, in addition to being the victim, was the sole eyewitness to the crime.

53.     When Stotler called 911 immediately after his encounter with the real perpetrator, he was not able to provide any identifying information, other than to say that the perpetrator was a Black male.

54.     Stotler's inability to describe the shooter is consistent with the fact that their encounter was brief, fast-moving, and traumatic, resulting in a severe brain injury. Based on the

8

circumstances of their encounter, Stotler could not have made an identification of the shooter in any circumstance.

55.     Nevertheless, on February 6, 1997, more than three weeks after the shooting, and having decided that Irons was their suspect, Defendants Hanlen, Neske, and others visited Stotler in the hospital to try to get him to make a photo identification of Irons.

56.     Defendant O'Neill, in coordination with these Defendants and others, prepared a suggestive photo array to present to Stotler. Irons's picture was in the third position. The Defendants enlarged and enhanced the photograph of Irons so that his picture stood out compared to the others in the array.

57.     Viewing the array, Stotler informed the Defendants that he could not identify any of the six photographs as being the person who entered his home and shot him.

58.     The Defendants' efforts to obtain an identification should have stopped there. But the Defendants refused to take no for an answer.

59.     The Defendants then instructed Stotler to view the array and make his "best guess" about who might have been the perpetrator.

60.     In response, Stotler indicated that the perpetrator could have been either the individual in the third position or the individual in sixth position, the two of whom looked nothing alike.

61.     Despite the fact that Stotler had not gotten a look at the perpetrator that would have allowed him to make an identification, that he did not identify Irons when shown the photo array, and that he guessed that one of two dissimilar photos might have been the perpetrator when pressed, the Defendants continued their efforts to manipulate Stotler into providing a positive identification of Irons.

62.     When Stotler was released from the hospital, the Defendants provided him with copies of their police reports and photographs from the investigation, including a photograph of Irons.

63.     Given Stotler's brain injury and lack of memory of the incident, providing him reports and a photograph of Irons allowed the Defendants to create an identification that they could not obtain using legitimate procedures.

64.     After Stotler studied the police reports and photographs, he identified Irons for the first time. In addition, by the time of Irons's trial, Stotler's initially vague description had evolved into an extremely detailed description of the perpetrator's clothing and facial features—a description that was based entirely on the police reports the Defendants provided to Stotler.

65.     The fabricated identification and description of Irons that the Defendants obtained from Stotler occurred only because the Defendants told him who he should select and how to describe Irons.

*The Defendants Fabricate a Confession and Attribute It to Irons*

66.     After his arrest on January 21, 1997, Irons was taken to the O'Fallon Police Department and interrogated separately by Defendants Hanlen and Morrell.

67.     When questioned both by Hanlen and by Morrell, Irons denied any involvement in the Stotler shooting and refused to answer further questions.

68.     Nevertheless, Hanlen and Morrell each wrote fabricated reports claiming that Irons confessed to each of them. Those reports were completely false.

69.     Irons never signed any written statement containing incriminating information. The only document Irons signed was a *Miranda* waiver form he was eventually given, in which he indicated that he was refusing to answer any questions.

70.    Hanlen took notes during his interrogation of Irons, but he destroyed those notes without showing them to anyone.

71.    During Hanlen's interrogation, Hanlen refused to accept Irons's repeated denials, yelled at Irons, threatened him, and pushed on his forehead.

72.    When Morrell interrogated Irons later that night, he took Irons to a room and began recording the interrogation on a video camera. After Irons repeatedly denied any involvement in the crime, Morrell became upset, grabbed Irons, and threw him against the wall. He then walked over to the video camera, removed the videocassette, and left the room. That recording was never disclosed.

73.    Hanlen and Morrell each wrote fabricated police reports documenting their made-up claims that Irons confessed to them and concealing the fact that Irons had repeatedly denied any knowledge or involvement in the Stotler shooting.

*The Defendants Fabricate Statements From Other Witnesses to Bolster Their Case Against Irons*

74.    In addition to the actions above, the Defendants—including Defendants Hanlen, Neske, Tinkham, and O'Neill—coerced and manipulated witnesses and wrote fabricated reports falsely documenting their interviews with witnesses to further bolster their case against Irons.

75.    For example, the Defendants physically abused one witness, and threatened and pressured another, into falsely claiming that Irons made incriminating statements to each of them.

76.    In at least one case, a witness's handwritten statement suddenly disappeared.

77.    Upon information and belief, the Defendants destroyed or otherwise suppressed the statement because it contained evidence of Irons's innocence.

11

**Irons's Wrongful Prosecution and Conviction**

78.     Between 1997 and 1998, as the result of the Defendants' misconduct and based solely on the Defendants' fabricated evidence described in this Complaint, Irons was arrested, prosecuted, and convicted of the Stotler shooting.

79.     In the absence of the Defendants' misconduct, Irons would never have been arrested, prosecuted, or convicted.

80.     At no point in time between 1997 and the present day has there been any credible evidence giving rise to probable cause to suspect Irons of shooting Stotler.

81.     The Defendants' fabrication of evidence was not disclosed to prosecutors, Irons, or his criminal defense attorneys in advance of his criminal trial. In fact, the Defendants suppressed evidence that was later used to exonerate Irons.

82.     The Defendants used false police reports to cover up their misconduct. They provided those false reports to state prosecutors, and those reports became the basis for charging and prosecuting Irons.

83.     The Defendants also gave false statements before trial and provided false testimony at Irons's criminal trial.

84.     No inculpatory evidence other than the evidence fabricated by the Defendants was introduced at Irons's criminal trial.

85.     At all times, the Defendants suppressed the true circumstances surrounding the crime scene evidence, the identification procedures used with Stotler, their interviews with witnesses, and their interrogations of Irons.

86.     In addition, on information and belief, the Defendants suppressed and destroyed additional evidence, including information still unknown to Irons, which would also have shown Irons's innocence.

87.     Irons maintained his innocence throughout the proceedings.

88.     However, because of the Defendants' false and manufactured evidence, Irons was wrongly convicted and sentenced to decades in prison.

89.     Irons was only 16 years old when his ordeal began. He spent the next 23 years of his life imprisoned for a crime that he did not commit.

90.     Irons's whole life was turned upside down without any warning. His teenage years and his young adulthood were entirely consumed by the horror of his wrongful imprisonment.

91.     In addition, Irons was taken away from, and missed out on, the lives of his family and friends. He missed special occasions and milestones, and he returned home to relationships changed by or lost to over two decades of wrongful incarceration.

92.     He lost family members and loved ones while he was wrongfully imprisoned. His grandmother—the woman who raised him and whom he considered like a mother—passed away while he was in prison. He did not get to see her before she died, and he could not attend her funeral.

93.     Irons was robbed of his teenage years and his young adulthood. He was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Irons has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

94.     During his 23 years of wrongful imprisonment, Irons was detained in harsh and dangerous conditions in maximum-security prisons.

95.     Irons never knew whether the truth would come out or whether he would ever be exonerated.

96.     In addition to the severe trauma of wrongful imprisonment and Irons's loss of liberty, the Defendants' misconduct continues to cause Irons extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

97.     Irons has been branded as a killer. He has suffered profound reputational harm as a result.

### Irons's Exoneration

98.     Irons fought hard to prove his innocence. He appealed and filed requests to have his conviction thrown out.

99.     In March 2020, Irons's state petition for a writ of habeas corpus was granted and his conviction was vacated.

100.    On July 1, 2020, all charges against Irons were dropped.

101.    At the time of his exoneration, Irons had been fighting the false charges against him for more than half his life.

### COUNT I

### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

102.    Irons incorporates each paragraph of this Complaint as if fully restated here.

103.    As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Irons of his constitutional right to due process and his right to a fair trial.

104.     In the manner described more fully above, the Defendants fabricated and solicited false evidence, including false witness statements and fabricated police reports and other evidence falsely implicating Irons in the crime, obtained charges against Irons, secured his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Irons during his criminal case.

105.     The Defendants obtained Irons's conviction using this false evidence and they failed to correct fabricated evidence that they knew to be false when it was used against Irons during his criminal case.

106.     The Defendants also procured a supposed eyewitness identification implicating Irons in the crime by using unduly suggestive identification techniques during photo identifications and in subsequent identification procedures. The Defendants knew that these identifications were false and unreliable, but they caused them to be used during Irons's criminal trial. These fabricated identifications caused Irons's wrongful conviction.

107.     In addition, the Defendants deliberately withheld exculpatory evidence from prosecutors, Irons, and Irons's criminal defense attorneys, including evidence that an unidentified person's fingerprint was found at the intruder's point of exit, that the sole eyewitness could not make an identification without being fed information in reports and photographs, that the Defendants had made up confessions that Irons never gave, that the Defendants manufactured false witness statements to bolster their case, and that the Defendants had fabricated police reports, thereby misleading and misdirecting the criminal prosecution of Irons.

108.     In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Irons.

109.     The Defendants' misconduct described in this count resulted in the unjust and wrongful criminal prosecution and conviction of Irons and the deprivation of Irons's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Irons could not have, and would not have, been pursued.

110.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Irons's clear innocence.

111.     As a result of the Defendants' misconduct described in this Count, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

112.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of O'Fallon and the O'Fallon Police Department, and St. Charles County and the St. Charles County Sheriff's Department, in the manner more fully described below in Count V.

## COUNT II

### 42 U.S.C. § 1983 – Illegal Detention and Prosecution
### (Fourth and Fourteenth Amendments)

113.     Irons incorporates each paragraph of this Complaint as if fully restated here.

114.     In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Irons of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Irons without any probable cause for doing so and in

16

spite of the fact that they knew Irons was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

115.    In so doing, the Defendants caused Irons to be deprived of his liberty without probable cause, detained without probable cause, and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

116.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Irons's clear innocence.

117.    As a result of the Defendants' misconduct described in this Count, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

118.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of O'Fallon and the O'Fallon Police Department, and St. Charles County and the St. Charles County Sheriff's Department, in the manner more fully described below in Count V.

**COUNT III**

**42 U.S.C. § 1983 – Failure to Intervene**

119.    Irons incorporates each paragraph of this Complaint as if fully restated here.

120.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Irons's constitutional rights, even though they had the duty and the opportunity to do so.

121.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Irons's clear innocence.

122.    As a result of the Defendants' failure to intervene to prevent the violation of Irons's constitutional rights, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

123.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of O'Fallon and the O'Fallon Police Department, and St. Charles County and the St. Charles County Sheriff's Department, in the manner more fully described below in Count V.

## COUNT IV

### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

124.    Irons incorporates each paragraph of this Complaint as if fully restated here.

125.    In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Irons for the Stotler shooting, regardless of Irons's guilt or innocence, and thereby to deprive him of his constitutional rights.

126.    In so doing, the Defendants and their co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

127.    In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Irons of his rights.

128.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

129.     As a result of the Defendants' agreement, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

130.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Irons's clear innocence.

131.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of O'Fallon and the O'Fallon Police Department, and St. Charles County and the St. Charles County Sheriff's Department, in the manner more fully described below in Count V.

## COUNT V

### 42 U.S.C. § 1983 – Policy and Custom Claims
### Against the City of O'Fallon and St. Charles County

132.     Irons incorporates each paragraph of this Complaint as if fully restated here.

133.     The City of O'Fallon and St. Charles County routinely worked together on criminal investigations.

134.     The City of O'Fallon and St. Charles County employed the individual Defendants, supervised them, and promulgated policy, including written policies and unwritten customs, that caused the wrongful conviction of Irons, as described above.

135.     Irons's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the City of O'Fallon and St.

Charles County, as well as by the actions of policy-making officials for the City of O'Fallon and St. Charles County.

136.     At all times relevant to the events described in this complaint and for a period of time before and after, the City of O'Fallon and St. Charles County failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of eyewitness identification procedures; the conduct of interrogations and questioning of criminal suspects and witnesses by officers and agents of the St. Charles County Sheriff's Department and the O'Fallon Police Department; obtaining statements and testimony from witnesses; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative notes; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

137.     In addition, or alternatively, the City of O'Fallon and St. Charles County failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the O'Fallon Police Department and the St. Charles County Sheriff's Department with respect to the conduct of eyewitness identification procedures; the conduct of interrogations and techniques to be used when questioning criminal suspects and witnesses; obtaining statements and testimony from witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative

notes; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

138.    Officers and agents of the City of O'Fallon and St. Charles County committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

139.    Had officers and agents of the City of O'Fallon or St. Charles County promulgated appropriate policies, then the violation of Irons's constitutional rights would have been prevented.

140.    At all times relevant to the events described in this complaint and for a period of time before and after, the City of O'Fallon and St. Charles County had notice of practices and customs of officers and agents of the O'Fallon Police Department and St. Charles County Sheriff's Department that included one or more of the following: (1) officers fabricated statements and testimony of witnesses and/or manipulated or threatened witnesses into making false statements; (2) officers manipulated witnesses to incriminate suspects in photo and live identification procedures; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and (5) officers failed to disclose exculpatory evidence during criminal trials.

141.    These practices and customs, individually and/or together, flourished because the leaders, supervisors, and policymakers of the City of O'Fallon and/or St. Charles County directly encouraged, and were thereby the moving force behind, the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper investigation and interrogation techniques, and by failing to adequately punish and discipline

prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Irons.

142.    The above practices and customs, so well settled as to constitute *de facto* policies of the City of O'Fallon and St. Charles County, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

143.    The City of O'Fallon and St. Charles County have been on notice of these polices, practices, and customs and the risk of harm that they posed.

144.    For example, in addition to the misconduct at issue in this case, the former O'Fallon Police Chief Steve Talbott, who held that role during Irons's wrongful arrest, prosecution, and conviction, was fired in 2005 after allegations that Talbott mishandled an investigation. Chief Talbott and another O'Fallon officer were connected to a corruption investigation carried out by the mayor.

145.    The individual Defendants also have a history of misconduct. For instance, Defendant Morrell was implicated in mishandling the case of Darrell Devine, who was convicted of stealing a purse in 2001. Devine alleged that Defendant Morrell mishandled the investigation, manipulated a witness into selecting his photo, and committed perjury at trial.

146.    This is not the only instance of complaints launched against Defendant Morrell for engaging in misconduct such as fabricating evidence and perjury. The same year, Chief Talbott was informed of and declined to conduct an investigation into Defendant Morrell pertaining to similar allegations of misconduct by a defendant.

147.    Further, in or around 1991, O'Fallon police officers, including Defendant Morrell, were investigated for entering a trailer without a warrant. While Defendant Morrell was cleared

22

of wrongdoing in that instance, upon information and belief and based on the instances annotated herein, Morrell has, in concert with the other Defendants, engaged in a pattern and practice of misconduct with little to no repercussions.

148.    Finally, it was uncovered that 39 criminal investigations conducted by O'Fallon police officers, including Defendant Morrell, were mishandled between 2005 and 2008. Defendant Morrell was suspended without pay and given a choice of retiring or being demoted. He chose retirement.

149.    Defendant Tinkham also has a history of past misconduct, including manipulating witnesses and lying under oath. For instance, a jury found that Defendant Tinkham unlawfully conducted a raid on a family's home in 1996 based on a search warrant that was obtained through false information. Defendant Tinkham and the officers learned prior to the search that the information may have been unreliable as the informant's mother told the officers her son was a manic-depressive and pathological liar, and the informant stated he told the officers he was lying to get a reduced sentence, but the officers instructed him to write his prior statement anyway. Despite this, Defendant Tinkham requested a search warrant and falsely stated that the informant had provided reliable information in the past, while making no mention of the informant's lack of credibility. A jury awarded the plaintiffs in that case $2 million. Defendant Hanlen was Defendant Tinkham's supervisor at the time.

150.    Defendant Hanlen bragged about his misconduct while on the force in a blog called "War Stories." The blog demonstrates Hanlen's disdain for authority, his ability to engage in, and even take enjoyment from, egregious police misbehavior, and his willingness and success in covering up such misbehavior.

151.     In addition, as a matter of both policy and practice, policy makers and supervisors condoned and facilitated a "blue wall of silence" or "blue code" within the St. Charles County Sheriff's Department. The existence of this blue code or blue wall of silence, the lack of adequate policies for the County's internal affairs division, and the culture of condoning and covering up misconduct was described in *D.B. v. St. Charles Cnty.*, No. 4:12-CV-654-JAR (E.D. Mo.).

152.     In sum, the final policy makers for the City of O'Fallon and St. Charles County had notice of illegal policies and practices, and they repeatedly approved of, adopted, and ratified the unlawful actions of officers and agents, including the Defendants, including their violations of Irons's constitutional rights.

153.     Irons's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the City of O'Fallon and St. Charles County, including but not limited to the Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

## COUNT VI

## State Law Claim – Malicious Prosecution

154.     Irons incorporates each paragraph of this Complaint as if fully restated here.

155.     In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Irons of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Irons without any probable cause for doing so.

156.    In so doing, the Defendants caused Irons to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and/or continued maliciously, resulting in injury.

157.    The judicial proceedings were terminated in Irons's favor and in a manner indicative of his innocence when his conviction was vacated and all charges against him were dropped.

158.    The misconduct described in this Count was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Irons's clear innocence.

159.    As a result of the Defendants' misconduct described in this Count, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### State Law Claim – Intentional Infliction of Emotional Distress

160.    Irons incorporates each paragraph of this Complaint as if fully restated here.

161.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Irons, as is more fully alleged above.

162.    As a result of the Defendants' misconduct described in this Count, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### State Law Claim – Civil Conspiracy

163.     Irons incorporates each paragraph of this Complaint as if fully restated here.

164.     As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Irons for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Irons of these rights.

165.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

166.     The violations of law described in this complaint were accomplished by the Defendants' conspiracy.

167.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and of Irons's clear innocence.

168.     As a result of the Defendants' misconduct described in this Count, Irons suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### State Law Claim – *Respondeat Superior*

169.     Irons incorporates each paragraph of this Complaint as if fully restated here.

170.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of O'Fallon and St. Charles County, acting at all relevant times within the scope of their employment.

171.    Defendants City of O'Fallon and St. Charles County are liable as principal for all torts committed by their agents.

## COUNT X

## State Law Claim – Indemnification

172.    Irons incorporates each paragraph of this Complaint as if fully restated here.

173.    The City of O'Fallon and/or St. Charles County are obligated under law to pay any tort judgment against their employees and agents.

174.    The Defendants were employees, members, and agents of the City of O'Fallon and St. Charles County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

175.    The City of O'Fallon and St. Charles County are responsible to pay any judgment entered against the Defendants. Irons therefore demands judgment against Defendants City of O'Fallon and St. Charles County, in the amounts awarded to Irons against the individual Defendants as damages, attorneys' fees, costs and interest.

WHEREFORE, Plaintiff JONATHAN IRONS, respectfully requests that this Court enter a judgment in his favor and against Defendants JOHN NESKE, RICHARD MORRELL, DOUGLAS TINKHAM, the ESTATE of MICHAEL HANLEN, RICKY LUETKENHAUS, MARK O'NEILL, UNKNOWN EMPLOYEES of the CITY OF O'FALLON and ST. CHARLES COUNTY, the CITY OF O'FALLON, and ST. CHARLES COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and, because they

acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual

Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JONATHAN IRONS, hereby demands a trial by jury pursuant to Federal Rule

of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**JONATHAN IRONS**

BY:     /s/ Josh Loevy
        *One of Irons's Attorneys*

Jon Loevy*
Anand Swaminathan*
Steven Art*
Makeba Rutahindurwa*
Josh Loevy
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, Illinois 60607
(312) 243-5900
joshl@loevy.com

*\*Application for Admission Approved Pending Oath*